**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| JAKE ELLIS DAUGHTRY, SANDRA | § | |
| MILLER DAUGHTRY, JAKE'S | § | |
| FIREWORKS, JOSEPH ELLIS | § | |
| DAUGHTRY, RIGHT PRICE | § | |
| CHEMICALS, LLC, BEST BUY | § | |
| INDUSTRIAL SUPPLY, LLC, LAB | § | |
| CHEMICAL SUPPLY, LLC, and | § | |
| DAUGHTRY INVESTMENTS, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:23-CV-343 |
| | § | |
| SILVER FERN CHEMICAL, INC. | § | |
| and GILDA FRANCO, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the court are Defendant Gilda Franco's ("Franco") Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) (#23) and Defendant Silver Fern Chemical, Inc.'s ("Silver Fern") Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim (#25). Plaintiffs[1] filed responses in opposition to both Franco's (#27) and Silver Fern's (#30) motions. Franco (#32) and Silver Fern (#33) then filed replies. Having considered the motions, the parties' submissions, the pleadings, and the applicable law, the court is of the opinion that both motions should be granted.

---

[1] Plaintiffs in this case include Jake Ellis Daughtry ("Jake"), Jake's father, Joseph Ellis Daughtry ("Joseph"), Jake's mother, Sandra Miller Daughtry ("Sandra") (collectively, "the Daughtrys"), Jake's Fireworks, Right Price Chemicals, LLC ("Right Price"), Best Buy Industrial Supply, LLC ("Best Buy"), Lab Chemical Supply, LLC ("Lab Chemical"), and Daughtry Investments, LLC ("Investments") (all collectively referred to as "Plaintiffs").

I.    Background[2]

Plaintiffs' Amended Complaint, while far from a model of clarity, demonstrates that their claims arise from Silver Fern's and Franco's participation in an extensive criminal investigation, led by the Drug Enforcement Administration ("DEA"), regarding illegal drug distribution and money laundering.  During this investigation, the DEA discovered that the Daughtrys, through their businesses Jake's Fireworks and Right Price, were operating as wholesale distributors of 1, 4-butanediol ("BDO") and shipping the substance nationwide, often to unauthorized purchasers. BDO is a chemical that is commonly used as an industrial solvent, floor stripper, and automobile wheel-well cleaner as well as in the manufacture of certain plastics, elastic fibers, and polyurethanes.  BDO, however, can be used illicitly, as a substitute for the "date rape drug" gamma-hydroxybutyric acid ("GHB").  BDO and GHB have similar chemical structures, such that when BDO is ingested, it metabolizes into and has the same side effects as GHB, a Schedule I controlled substance.  (#21, Ex. 11).

After a lengthy investigation, a grand jury in the Eastern District of Texas returned a 24-count Indictment, naming Jake, Joseph, Sandra, and six codefendants.  The Indictment charged

---

[2] The facts recited in this opinion are taken primarily from Plaintiffs' (*Corrected*) First Amended Complaint ("Amended Complaint") (#21).  At this point, the court does not make any factual findings or determinations; rather, the court accepts Plaintiffs' well-pleaded facts as true for the purpose of deciding the current motions.  *See, e.g.*, *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (noting that at the 12(b)(6) stage, the court must construe all facts in favor of the nonmoving party); *Lytle v. Bexar County*, 560 F.3d 404, 409 (5th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  The court, however, also takes judicial notice of the docket entries made in *United States v. Daughtry et al.*, 1:20-CR-55 (the criminal case against the Daughtrys and codefendants), *United States v. Daughtry et al.*, 1:20-CV-305 (a civil action in which the United States sought to prevent the Daughtrys from continuing to operate Jake's Fireworks and Right Price), and *Daughtry, et al. v. Silver Fern Chemical, Inc. et al.*, 1:22-CV-239 (Plaintiffs' previous federal court action, in which they raised nearly the same claims presented in the case at bar) "to establish the fact of such litigation and related filings." *Moore v. City of Dallas*, No. 3:22-CV-0714-M-BT, 2023 WL 2589394, at *1 n.3 (N.D. Tex. Mar. 17, 2023) (citing *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998)).

2

the Daughtrys with conspiracy to possess with intent to distribute and distribution of a controlled substance analogue, in violation of 21 U.S.C. §§ 841, 846; conspiracy to possess with intent to distribute and distribution of a date rape drug over the internet to an unauthorized purchaser, in violation of 21 U.S.C. §§ 841(g), 846; and maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1).   Jake and Joseph were also charged with multiple counts of money laundering, in violation of 18 U.S.C. § 1957.   The Indictment asserted that two individuals died after consuming BDO that was sold by Right Price.   After negotiations with the United States Attorney's Office ("Government"), the charges against Sandra were dismissed, and Jake and Joseph chose to plead guilty.   Jake pleaded guilty to one count of conspiracy to possess with intent to distribute and distribution of a date rape drug over the internet to an unauthorized purchaser, in violation of 21 U.S.C. §§ 841(g), 846, and Joseph pleaded guilty to one count of money laundering, in violation of 18 U.S.C. § 1957.   In addition, the Government sought and obtained a permanent injunction enjoining the Daughtrys from using Jake's Fireworks or Right Price to sell and distribute BDO.[3]

In this lawsuit, Plaintiffs contend that Silver Fern and Franco engaged in various forms of actionable fraud throughout their participation in the criminal investigation.   Although Plaintiffs' theories of liability are quite muddled, the crux of Plaintiffs' action rests on the premise that, on one occasion, Silver Fern or Franco provided the Government with false information, and, on a separate occasion, Silver Fern failed to provide Plaintiffs information when it had a duty to do so.

---

[3] Nonetheless, Plaintiffs, in this action (and others), assert that Jake and Joseph are innocent of the crimes to which they pleaded guilty and stand convicted.

The first communication Plaintiffs discuss in their Amended Complaint is an email sent from Franco to Jake on June 6, 2017.  In this email, Franco provided Jake with a "payment receipt" from a "past due invoice" and included the receipt as an attachment to the email.  The email also informed Jake that Franco would "process [a] new order for shipment ASAP."  Based on Plaintiffs' Amended Complaint, the Daughtrys conducted business with Silver Fern from 2017 to late 2019 or early 2020.

In early 2018, during the course of this relationship, the DEA began investigating the Daughtrys, along with Jake's Fireworks and Right Price.  After the DEA's investigation began, specifically on November 7, 2019, "the Government began requesting information from Silver Fern," and the two formed a "cooperative relationship."  Soon thereafter, on December 4, 2019, a Silver Fern employee sent an email to Right Price stating:  "It has come to our attention that although [BDO] is not a controlled substance listed by the DEA, it can be diverted for illicit use," and noting: "We can ship this out ASAP, but before we ship this to you, we need to have you fill out another regulatory form from the DEA."

In their complaint, Plaintiffs next focus on a decision made within Silver Fern that was not communicated to Plaintiffs.  After Silver Fern had been in contact with the Government for a time and the investigation into Right Price and the Daughtrys had progressed, Silver Fern decided to cease selling BDO.  Silver Fern made this decision on or near June 29, 2020, and, soon thereafter, informed its other customers of the decision, but deliberately chose not to provide this information to Right Price or the Daughtrys.  To support this assertion, Plaintiffs' Amended Complaint includes an email, sent from Silver Fern's president to Franco, with the subject line "RE: right price," stating that Silver Fern's "course of intended action is to advise the customer that we have

4

no available supply due to procurement issues from supplier [sic]," and clarifying: "We are not telling them we're getting out of the business at this point."  (#21, Ex. 10).

Plaintiffs' Amended Complaint then shifts its focus to a series of altered emails (Plaintiffs often refer to these emails as "fabricated") that were originally sent to Jake by Franco and later turned over to the Government, albeit in a different condition.  On February 26, 2021, a Silver Fern manager asked Franco to provide "all . . . emails exchanged with [her] contact[ ] at Right Price" so that Silver Fern could provide these emails to the Government.  (#21, Ex. 9).  Plaintiffs contend that, upon receiving this request, Franco proceeded to alter various emails she had previously sent to Jake—including the June 6, 2017, email mentioned above.  Plaintiffs claim that Franco added to these emails a notation in the attachment section, indicating that a "safety data sheet" ("SDS") for BDO had been sent with each email, and, in the body of these emails, a line informing the recipient that an SDS was attached.[4]  (#21, Ex. 3).  Plaintiffs discovered that this alteration had occurred only after the Government disclosed Franco's emails to Jake in his criminal case.

At bottom, Plaintiffs appear to contend that Silver Fern and Franco (along with others) "conspired" to "commit fraud on . . . Plaintiffs," which they assert is evidenced by the above communications.  Plaintiffs aver that Silver Fern and Franco's conduct formed "the basis for the

---

[4] Later in 2021, after it came to light that these emails had been altered, Silver Fern conducted an internal investigation, which is memorialized in a Memorandum that Plaintiffs included as an exhibit to their Amended Complaint.  (#21, Ex. 13).  The Memorandum clarifies that Silver Fern's employees "were told that [they] had to send the SDSs with every shipment" and could not "rely on the warehouse to send them."  *Id*.  The Memorandum goes on to note that "Franco explained that she knew that it was company policy for her to provide the SDS, and that she feared she would get audited by her manager for not doing so."  *Id*.  "[S]o she altered the email, and did not tell anyone about it."  *Id*.  In their Amended Complaint, however, Plaintiffs dispute this explanation and contend that this was not Franco's true motivation. Moreover, at this stage of the litigation, Franco has not admitted that she altered the emails in question.

Government['s] . . . civil and criminal prosecution[s]," "result[ing] in [the Daughtrys] being criminally charged" and having various assets seized.  Plaintiffs acknowledge that, at the core of the Government's prosecution for conspiracy to distribute BDO (of which only Jake was convicted) is the requirement that the Government show that a defendant was aware that he was distributing BDO to an unauthorized purchaser and the product was intended for human consumption.  *See* 21 U.S.C. §§ 813, 841(g)(1)(A)-(B), and 841(g)(2)(B)(i)-(iii).  Plaintiffs assert that Franco's email alterations, combined with Silver Fern's production of these emails to the Government, created the perception that a "voluntary industry standard" was required to "ensure sales were not diverted from legitimate channels" that, in reality, never existed, and by which the Daughtrys were judged.  In Plaintiffs' view, this "standard" was based solely upon the SDS that Silver Fern purportedly sent to Jake as early as 2017 but, in actuality, never provided.  Plaintiffs maintain that the Government held Plaintiffs to the "standard" with which Silver Fern appeared to comply—that is, sending an SDS with every receipt or shipment.  Plaintiffs continue, citing the above communications, arguing that Silver Fern and Franco committed various acts of fraud against Plaintiffs.  In any event, Plaintiffs contend that without Silver Fern's and Franco's acts of "fraud," Plaintiffs would not have been successfully prosecuted or had their assets seized.[5]

---

[5] While Plaintiffs' fraud claims will be discussed in greater detail below, at this point, it is worth noting a few issues with the theories lodged in Plaintiffs' Amended Complaint.  At this stage, the court takes Plaintiffs' well-pleaded facts as true.  Nonetheless, where an assertion in the complaint conflicts with filings upon which the complaint itself relies, that fact is worthy of note.  *Cf. Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir.) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control."), *cert. denied*, 311 U.S. 685 (1940); *Hoffman v. L & M Arts*, No. 3:10-CV-0953, 2011 WL 3567419, at *9 (N.D. Tex. Aug. 15, 2011).  Plaintiffs' complaint alleges that the linchpin of the false "voluntary industry standard" is the SDS that Silver Fern never actually sent to Plaintiffs.  To support this point, Plaintiffs cite "DEA Contract Investigator" Jerry Salameh's ("Salameh") testimony from a September 2, 2022, hearing in the civil action the Government filed against some of the same plaintiffs in this case, *United States v. Daughtry et al.*, 1:20-CV-305.  Plaintiffs' complaint states that Salameh testified "that in order for [Right Price] to comply

In light of these allegations, Plaintiffs assert that Silver Fern and Franco committed common law fraud, fraud by nondisclosure, constructive fraud, negligent misrepresentation, failure to warn, and civil conspiracy.  In response, both Defendants filed motions to dismiss.  In its motion, Silver Fern contends that this action should be dismissed for lack of subject matter jurisdiction and for failure to state a claim.  Franco, in her motion, asserts the same arguments as Silver Fern, but she also maintains that this court lacks personal jurisdiction over her, such that she should be dismissed from the case.

II.     Subject Matter Jurisdiction

A motion to dismiss filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the subject matter jurisdiction of the federal district court.  *See* FED. R. CIV. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction."  *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. ___, 139 S. Ct. 1743, 1746 (2019) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  "They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *Rasul v. Bush*, 542 U.S.

---

with federal law, it would have needed to 'maintain the same protocols . . . Silver Fern Chemical put on Right Price Chemicals as certifying Right Price Chemicals was an authorized buyer and meeting all the parameters of the vetting procedure.'"  (1:20-CV-305, #44).  Plaintiffs suggest that this comment relates to providing SDSs; however, when read in context, Salameh appears to be referring to "authorized purchaser forms" (a form provided to a purchaser by the seller in which the purchaser confirms that it has some legitimate purpose for buying BDO) and the burden imposed on a supplier to confirm that it is selling to authorized purchasers.  Salameh does not discuss SDSs in his testimony.  Indeed, Plaintiffs' theory is questionable—no matter how much information regarding BDO (and its relation to GHB) a seller provides to a purchaser, that information will not transform an unauthorized purchaser into an authorized purchaser.  In fact, in their complaint, Plaintiffs seemingly confuse an SDS with an authorized purchaser form.  For example, Plaintiffs state that "[b]y going back in time to manipulate emails allegedly sent before the regulations changed," Silver Fern and Franco "caused confusion related to the standard of care for *end user forms*."  Plaintiffs, however, make no other mention of "end user forms" or, rather, "authorized purchaser forms" in their complaint.  Further, Plaintiffs do not explain how receiving the SDS from Silver Fern would have prevented them from selling to unauthorized purchasers.

466, 489 (2004) (quoting *Kokkonen*, 511 U.S. at 377 (citations omitted)).  Accordingly, the court
"must presume that a suit lies outside this limited jurisdiction, and the burden of establishing
federal jurisdiction rests on the party seeking the federal forum."  *Gonzalez v. Limon*, 926 F.3d
186, 188 (5th Cir. 2019) (citing *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir.), *cert.
denied*, 534 U.S. 993 (2001)).

A.     Standing

The absence of Article III standing "is a defect in subject matter jurisdiction," and
therefore provides appropriate grounds for the court to dismiss an action pursuant to Rule 12(b)(1)
for want of subject matter jurisdiction.  *Goberman v. Cascos*, No. 3:16-CV-0994-G, 2016 WL
3688604, at *2 (N.D. Tex. Jul. 12, 2016) (citing *Bender v. Williamsport Area Sch. Dist.*, 475
U.S. 534, 541-42 (1986)); *see Va. House of Delegates v. Bethune-Hill*, 587 U.S. ___, 139 S. Ct.
1945, 1950-51 (2019) (recognizing that standing is required for an Article III court to have
jurisdiction); *Cell Sci. Sys. Corp. v. La. Health Serv.*, 804 F. App'x 260, 262-63 (5th Cir. 2020);
*Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (5th Cir. 2009).

"The standing doctrine defines and limits the role of the judiciary and is a threshold inquiry
to adjudication."  *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003) (citing *Warth v. Seldin*,
422 U.S. 490, 517-18 (1975)); *see Va. House of Delegates*, 139 S. Ct. at 1950 (recognizing that
standing is required for an Article III court "[t]o reach the merits of a case"); *Singh v. RadioShack
Corp.*, 882 F.3d 137, 150-51 (5th Cir. 2018).  Standing to sue means that "a party has a sufficient
stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy."
*Sierra Club v. Morton*, 405 U.S. 727, 731-32 (1972); *accord Singh*, 882 F.3d at 150-51; *Save Our*

*Cmty. v. U.S. EPA*, 971 F.2d 1155, 1160 (5th Cir. 1992); *Ranolls v. Dewling*, 223 F. Supp. 3d 613, 617-18 (E.D. Tex. 2016).

The standing inquiry involves both constitutional limitations on federal court jurisdiction, rooted in Article III, as well as prudential limitations on its exercise.  *See Singh*, 882 F.3d at 151 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014)).  "[T]o establish Article III standing, a party must demonstrate a case or controversy."  *Serafine v. Crump*, 800 F. App'x 234, 236 (5th Cir. 2020) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471-76 (1982)).  To do so, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *accord TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560-61); *Lefebure v. D'Aquilla*, 15 F.4th 650, 653 (5th Cir. 2021).  Importantly, "[a]s the part[ies] invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing."  *TransUnion*, 594 U.S. at 430-31 (citing *Lujan*, 504 U.S. at 561); *Va. House of Delegates*, 139 S. Ct. at 1951; *Singh*, 882 F.3d at 150-51; *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

B.    Injury in Fact

Defendants first contend that three Plaintiffs—Best Buy, Lab Chemical, and Investments—lack standing because they have failed to allege that they suffered any injury at all.  On this point, Defendants are correct.  An "injury in fact" means "an invasion of a legally protected interest which is" both "concrete and particularized . . . and . . . actual or imminent,

not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotations and citations omitted).  The injury "must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1. Plaintiffs' Amended Complaint does not allege that these entities suffered any injury or are sufficiently connected to the harms that are alleged in the Amended Complaint.

Nonetheless, at this early stage, "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006); *see Dep't of Com. v. New York*, 588 U.S. ___, 139 S. Ct. 2551, 2565 (2019). Accordingly, although each plaintiff must ultimately demonstrate standing to obtain relief, the court may proceed to the merits if at least one plaintiff has standing to pursue each claim asserted. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *Braidwood Mgmt. Inc. v. Becerra*, 627 F. Supp. 3d 624, 638 (N.D. Tex. 2022).  To that end, the Amended Complaint alleges that Jake, Joseph, Sandra, Right Price, and Jake's Fireworks suffered some injury.[6]  The complaint clarifies that Jake, Joseph, and Sandra were all indicted and initially prosecuted, although the charges against Sandra were later dismissed.  As to Right Price and Jake's Fireworks, the complaint alleges that the July 15, 2020, search and seizure involved property attributable to both businesses.

C.    Traceability

Defendants next contend, however, that, even setting aside their assertion that Best Buy, Lab Chemical, and Investments failed to allege any injury, none of the Plaintiffs can establish

---

[6] Silver Fern also contends that the complaint fails to allege that Sandra suffered any injury sufficient to satisfy Article III; however, for the reasons that follow, the allegations in the complaint demonstrate otherwise.

standing in this action due to temporal constraints.[7]   They argue that the harm about which Plaintiffs complain is not traceable to Defendants' fraud because the claimed fraudulent conduct occurred after Plaintiffs were injured.  The traceability component of Article III standing requires "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. Specifically, Defendants assert that, because the conduct about which Plaintiffs complain occurred in or around February 2021 (according to Silver Fern's internal Memorandum (#21, Ex. 13)), the conduct is not traceable to Plaintiffs' alleged harm—that harm ostensibly being the June 3, 2020, Indictment and the July 15, 2020, raid and property seizure.

The traceability issue, however, is more complex than Defendants allege.  Although not entirely clear, two key points from Plaintiffs' complaint are apparent.  First, Plaintiffs dispute the time frame established in the Silver Fern Memorandum.  Plaintiffs clarify in their response to Silver Fern's motion to dismiss that, in their view, the email alterations must have occurred prior to the Daughtrys being indicted.  Although nebulous, this view is indeed confirmed by allegations made in Plaintiffs' complaint.  (#21, p. 8, 10, 12, 13, 15).  Second, Plaintiffs contend that Defendants engaged in fraudulent conduct other than email alteration.  Plaintiffs assert, for instance, that Silver Fern committed fraud by failing to disclose to Plaintiffs in June 2020 that it was no longer selling BDO.  Further, Plaintiffs allege that they were also harmed by the civil proceeding through which they were enjoined from continuing to sell BDO, an event that clearly occurred after Franco's alleged email alteration—even according to the dates set forth in Silver Fern's internal Memorandum.  Thus, a close reading of Plaintiffs' complaint demonstrates that

---

[7] Defendants appear to concede that Jake, Joseph, Right Price, and Jake's Fireworks suffered an injury in fact for purposes of Article III standing.

there are multiple injuries about which Plaintiffs complain that are traceable to the alleged fraudulent acts Plaintiffs contend Defendants committed.  Accordingly, Plaintiffs have satisfied their burden of demonstrating Article III standing such that the court may address the merits of Plaintiffs' claims.[8]

III.    Personal Jurisdiction

A motion to dismiss filed under Rule 12(b)(2) of the Federal Rules of Civil Procedure challenges the court's personal jurisdiction.  *See* FED. R. CIV. P. 12(b)(2).  Thus, before reaching the merits, the court must address Franco's challenge to the court's exercise of personal jurisdiction over her.  Franco, a citizen of Arizona, contends that this court does not have personal jurisdiction, either general or specific, over her, and, thus, she must be dismissed from the action.

When a nonresident defendant files a motion to dismiss for lack of personal jurisdiction, the party seeking to invoke federal court jurisdiction over the nonresident defendant has the burden of showing that the exercise of personal jurisdiction is proper.  *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018); *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 211 (5th Cir. 2016); *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014).  When a "court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, that burden requires only that the nonmovant make a *prima facie* showing."  *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 495 (5th Cir. 2022) (quoting *Herman v. Cataphora, Inc.*, 730 F.3d 460, 464 (5th Cir. 2013)).  Moreover, at the 12(b)(2) stage, where no evidentiary hearing is held, the court accepts

---

[8] While Defendants make passing references to redressability, they do not specifically challenge Plaintiffs' standing on that basis.

all Plaintiffs' uncontroverted allegations as true, so long as the allegations are not merely conclusory, and resolves all factual conflicts in Plaintiffs' favor.  *Ritter*, 768 F.3d at 431; *E. Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 295 (5th Cir. 2020); *Diagnostic Affiliates of Ne. Hou, LLC v. Aetna, Inc.*, 654 F. Supp. 3d 595, 603 (S.D. Tex. 2023).

"A nonresident defendant is subject to personal jurisdiction in a federal diversity suit to the extent permitted by the laws of the forum state and considerations of constitutional due process." *Danziger & De Llano, L.L.P.*, 24 F.4th at 495 (quoting *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*, 963 F.2d 90, 93 (5th Cir. 1992)); *see Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 261-62 (2017).  "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Danziger & De Llano, L.L.P.*, 24 F.4th at 495 (quoting *Sangha*, 882 F.3d at 101).  In that regard, federal due process "requires that the defendant have 'minimum contacts' with the forum state . . . and that exercising jurisdiction is consistent with 'traditional notions of fair play and substantial justice.'"  *Sangha*, 882 F.3d at 101 (quoting *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)); *see Danziger & De Llano, L.L.P.*, 24 F.4th at 495.  "'Minimum contacts' can give rise to either specific jurisdiction or general jurisdiction." *Sangha*, 882 F.3d at 101 (quoting *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001)); *Ritter*, 768 F.3d at 431 (quoting *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002)); *see Bristol-Myers Squibb Co.*, 582 U.S. at 262.

A.    General Jurisdiction

General jurisdiction is "difficult" to establish "and requires 'extensive contacts between a defendant and a forum.'"  *Sangha*, 882 F.3d at 101-02 (quoting *Johnston*, 523 F.3d at 609).

Specifically, "general jurisdiction" applies when the defendant's contacts with the state, although they have no necessary relationship to the causes of action, "are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State." *Id*. at 101 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see Ritter*, 768 F.3d at 432. "Even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required . . . . [V]ague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Sangha*, 882 F.3d at 102 (quoting *Johnston*, 523 F.3d at 609). Furthermore, "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Bristol-Myers Squibb Co.*, 582 U.S. at 262 (quoting *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919).

Here, Franco is clearly not "at home" in Texas. Franco is a citizen of Arizona, and the accumulation of Franco's contacts with Texas, as alleged in the complaint, fall far short of "continuous and systematic." *See Sangha*, 882 F.3d at 101; *Cunningham v. Upwell Health, LLC*, No. 4:19-CV-894, 2020 WL 4723175, at *4 (E.D. Tex. July 21, 2020), *adopted by* No. 4:19-CV-894, 2020 WL 4698322 (E.D. Tex. Aug. 13, 2020). According to Plaintiffs' Amended Complaint, Franco's contacts with Texas took two forms: first, Franco's sending various emails to Jake, who was in Texas at the time, regarding BDO purchases from Silver Fern; and second, her providing altered emails to the Government in Texas directly or by way of her employer, Silver Fern. These allegations are wholly insufficient to establish general jurisdiction. *See Cunningham*, 2020 WL 4723175, at *4; *Clement Grp., LLC v. ETD Servs., LLC*, No. 4:16-CV-00773, 2017 WL 2972877, at *3 (E.D. Tex. July 12, 2017).

B.     Specific Jurisdiction

The question then becomes whether these same contacts are sufficient to give rise to specific jurisdiction over Franco.  "Specific jurisdiction may exist 'over a nonresident defendant whose contacts with the forum state are *singular* or sporadic only if the cause of action asserted arises out of or is related to those contacts.'"  *Sangha*, 882 F.3d at 101 (quoting *Int'l Energy Ventures Mgmt., L.L.C.*, 818 F.3d at 212); *see Bristol-Myers Squibb Co.*, 582 U.S. at 262; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985).  Further, the nonresident defendant must have "purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there."  *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006); *see Sangha*, 882 F.3d at 101 (quoting *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008)); *see also Burger King Corp.*, 471 U.S. at 475.  These contacts, however, "must be the defendant's own choice and not 'random, isolated, or fortuitous.'"  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).

Accordingly, those defendants who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities."  *Burger King Corp.*, 471 U.S. at 473 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)).  Nonetheless, as noted above, the exercise of personal jurisdiction must also be "fair and reasonable."[9]  *Sangha*, 882 F.3d at 102.

---

[9] Only after a plaintiff "establishes minimum contacts between the defendant and the forum state" does "the burden of proof shift[ ] to the defendant to show that the assertion of jurisdiction is unfair and unreasonable."  *Sangha*, 882 F.3d at 102.

When arguing that this court has specific jurisdiction over Franco, Plaintiffs point to the same two contacts discussed above.  On this note, Franco contends that, contrary to Plaintiffs' assertions, neither her emails to Jake nor her provision of the altered emails to the Government constitute minimum contacts for the purpose of specific personal jurisdiction.  Further, with regard to the emails she sent to Jake, Franco contends that the "fiduciary shield" doctrine applies to her conduct, meaning that, because she was acting on behalf of her employer Silver Fern, these contacts cannot be used to maintain jurisdiction over her.  In addition, as to her provision of the altered emails, Franco argues that this contact does not "constitute purposeful availment . . . of the privileges of conducting activities in Texas."

1.    Email Correspondence

The "fiduciary shield" doctrine provides that, ordinarily "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation." *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985); *Cypers v. PHI-BCC, LLC*, No. 4:21-CV-00382, 2022 WL 79837, at *4 (E.D. Tex. Jan. 7, 2022).  Indeed, "jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation." *Stuart*, 772 F.2d at 1197 n.11; *see Smith v. Antler Insanity, LLC*, 58 F. Supp. 3d 716, 721 (S.D. Miss. 2014) ("[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." (quoting *Keeton*, 465 U.S. at 781 n.13)).  Doubtless, however, the doctrine is not without limitation.  The doctrine provides no protection where, for example, "individual officers, as agents of the corporation[,] would be personally liable to any third person they injured by virtue of their tortious activity even if such acts were performed within the scope of their employment as corporate

16

officers." *Stuart*, 772 F.2d at 1197; *Tex. Pellets, Inc. v. German Pellets GmbH*, No. 2:18-CV-178, 2019 WL 4557437, at *2 (E.D. Tex. Aug. 28, 2019), *adopted by sub nom*. *Tex. Pellets, Inc. v. Off. Unsecured Creditors Comm. of Tex. Pellets, Inc.*, No. 2:18-CV-178, 2019 WL 4538269 (E.D. Tex. Sept. 19, 2019); *see Hewlett-Packard Co. v. Byd:Sign, Inc.*, No. 6:05-CV-456, 2006 WL 2822151, at *6 (E.D. Tex. Sept. 28, 2006); *see also DLR, LLC v. Montoya*, 465 F. Supp. 3d 676, 683 (N.D. Tex. 2020).  With respect to this limitation, a defendant's "personal contacts with Texas while doing business" for her employer "may support specific jurisdiction over [the defendant] only if those contacts are part of an intentional tort or fraudulent act that gives rise to or relates to the instant causes of action." *Hewlett-Packard Co.*, 2006 WL 2822151, at *6; *see D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 548 (5th Cir. 1985); *DLR, LLC*, 465 F. Supp. 3d at 682 n.20.

Plaintiffs agree that Franco's initial emails to Jake were sent in association with BDO shipments made to Texas.  In response, Franco notes that any contact with Texas involving email correspondence was "strictly in [her] capacity as an employee or agent for her employer, Silver Fern," and asserts that she "is shielded from personal jurisdiction under the 'fiduciary-shield doctrine.'"  On this point, Franco is correct—her email contacts with Texas appear to relate only to her employment with Silver Fern.  In fact, Plaintiffs do not contend that Franco was engaging in "fraud" at the time she initially emailed Jake regarding BDO purchases and invoices, which occurred in the years prior to the raid and the Daughtrys' prosecution.[10]  Accordingly, while the "fiduciary shield" doctrine does not provide protection to an individual for her tortious activity

---

[10] Although this point will be discussed further below, it is notable that, to the extent Plaintiffs wish to assert a fraud claim based on these initial emails, they have failed to state a plausible claim.

(even when performed within the scope of her employment), Plaintiffs' Amended Complaint does not allege that Franco was engaging in fraudulent conduct when she first sent these emails.  It is only later, when Plaintiffs state that Franco altered the emails and provided them to the Government, that Plaintiffs contend the fraudulent conduct occurred.  That said, the email contacts to which Plaintiffs refer are not "part of an intentional tort or fraudulent act that gives rise to or relates to the instant causes of action" such that the "fiduciary shield" doctrine applies to these contacts.[11]  *See Hewlett-Packard Co.*, 2006 WL 2822151, at *6.  As a result, these initial email contacts do not support a *prima facie* showing of personal jurisdiction over Franco.

### 2.    Providing Altered Emails to the Government

Plaintiffs next assert that Franco's provision of altered emails "to the Government" while "knowing that they would be used" in the Daughtrys' "prosecution in the Eastern District of Texas" constitute minimum contacts for the purpose of personal jurisdiction.  On this point, Plaintiffs clarify that Franco or Silver Fern provided the altered "emails to the Government in response to a subpoena" at some point after Franco altered them.  Franco, on the other hand, contends that these actions do not constitute "purposeful availment . . . of the 'privileges of conducting activities' in Texas."

With respect to this contact, assuming that Franco is no longer behind the "fiduciary shield,"[12] Plaintiffs are nonetheless unable to demonstrate that Franco's provision of altered emails

---

[11] Importantly, for this same reason, even without the aid of the "fiduciary shield" doctrine, Plaintiffs are unable to support their claim of personal jurisdiction with these early email communications. According to the Amended Complaint, Plaintiffs' claims do not "arise" from these emails, which were sent after each of their BDO purchases but before the time that Plaintiffs contend the "fraud" occurred. *DLR, LLC*, 465 F. Supp. 3d at 682-84; *see Aviles v. Kunkle*, 978 F.2d 201, 204 (5th Cir. 1992).

[12] It appears that Franco is no longer protected by the "fiduciary shield" doctrine (nor does she contend otherwise) because Plaintiffs assert that Franco's email alteration and release of the emails to the

satisfies "minimum contacts" with Texas for the purpose of establishing specific jurisdiction. Contacts constituting "purposeful availment" "must arise out of contacts that the 'defendant [herself]' creates with the forum State," *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp.*, 471 U.S. at 475), and also "must be the defendant's own choice." *Ford Motor Co.*, 592 U.S. at 359.   Here, Franco did not create a meaningful contact with Texas when providing emails to the Government in response to a subpoena.  *See Lauck v. County of Campbell*, No. CV-21-08036, 2021 WL 2780868, at *4 (D. Ariz. July 2, 2021) ("Defendants did not themselves create a meaningful contact with Arizona when responding to the Subpoena.").  A subpoena is "a legal document requiring [an individual's] response," and, moreover, "[c]ourts have found that responding to a subpoena is not a voluntary act." *Lauck*, 2021 WL 2780868, at *4. Although Franco sent documents to "forum state individuals," that action was "initiated by the subpoena."[13]  *Id*.  Thus, Franco's provision of the altered emails to the Government in response to a subpoena was not her "own choice," and, as such, she did not create the contact with Texas herself.  *See Ford Motor Co.*, 592 U.S. at 359; *Walden*, 571 U.S. at 284; *Lauck*, 2021 WL 2780868, at *4.  Plaintiffs do not rely on any other communication or conduct on Franco's part to support their claim of personal jurisdiction.  Thus, Franco's providing the altered emails to the

_____

Government were all part of the fraudulent scheme alleged.  *See Stuart*, 772 F.2d at 1197.

[13] It is not entirely clear from the complaint whether Franco or Silver Fern sent the altered emails to the Government.  To be sure, the emails were sent in response to a subpoena; that is plainly stated in the complaint.  Parts of the complaint seem to suggest that the subpoena was sent to Silver Fern, and, if that were the case, Silver Fern would most likely have requested that Franco provide the emails to Silver Fern that she had previously sent to Jake for the company to forward to the Government.  If that were so, it would appear that Franco was not in direct contact with the Government at all.  In other words, her contact with Texas would have been by way of Silver Fern.  Nonetheless, because Plaintiffs repeatedly contend that Franco sent the emails to the Government, the court addresses this argument in that context.

Government does not support a *prima facie* showing of personal jurisdiction.  Therefore, the court must dismiss Franco as a defendant in this action for lack of personal jurisdiction.

IV.     Failure to State a Claim

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests only the formal sufficiency of the statement of a claim for relief and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face"); *Spano ex rel. C.S. v. Whole Foods, Inc.*, 65 F.4th 260, 262 (5th Cir. 2023) (quoting *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018)).  Such a motion is "not meant to resolve disputed facts or test the merits of a lawsuit" and "instead must show that, even in the plaintiff's best-case scenario, the complaint does not state a plausible case for relief." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 581 (5th Cir. 2020); *Oyekwe v. Rsch. Now Grp., Inc.*, 542 F. Supp. 3d 496, 502 (N.D. Tex. 2021); 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356 (3d ed. 2019).  In ruling on such a motion, the court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff.  *Hernandez v. Mesa*, 582 U.S. 548, 550 (2017); *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2571 (2022); *IberiaBank Corp.*, 953 F.3d at 345 (citing *Leal*, 731 F.3d at 410).  The court, however, does not "strain to find inferences favorable to the plaintiffs" or "accept conclusory

allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004); *accord Ruvalcaba v. Angleton Indep. Sch. Dist.*, No. 20-40491, 2022 WL 340592, at *3 (5th Cir. Feb. 4, 2022).

"[T]he plaintiff's complaint [must] be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged." *Oscar Renda Contracting, Inc. v. Lubbock*, 463 F.3d 378, 381 (5th Cir. 2006) (citing *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir. 1989)), *cert. denied*, 549 U.S. 1339 (2007); *Ramming*, 281 F.3d at 161; *Pathology Lab'y Inc. v. Mt. Hawley Ins. Co.*, 552 F. Supp. 3d 617, 621 (W.D. La. 2021). The "[f]actual allegations must be enough to raise a right to relief above the speculative level."[14] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *accord Spano ex rel. C.S.*, 65 F.4th at 262; *King v. Baylor Univ.*, 46 F.4th 344, 355 (5th Cir. 2022). A Rule 12(b)(6) motion to dismiss must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure. *Twombly*, 550 U.S. at 555. Further, "a complaint's allegations 'must make relief plausible, not merely conceivable, when taken as true.'" *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009)); *see King*, 46 F.4th at 355; *Longoria ex rel. M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 263

---

[14] Generally, the court may not look beyond the four corners of the plaintiff's pleadings. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 261 (5th Cir. 1999); *see King*, 46 F.4th at 356. The court may, however, consider "documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *see Innova Hosp. San Antonio, L.P.*, 892 F.3d at 726 ("[A] court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" (quoting *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011))). A court may also review documents "attached to a response to a motion to dismiss when [they are] sufficiently referenced in the complaint and [their] authenticity is unquestioned." *Am. Gen. Life Ins. Co. v. Mickelson*, No. H-11-3421, 2012 WL 1355591, at *2 (S.D. Tex. Apr. 18, 2012) (citing *Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 293-94 (5th Cir. 2008)).

(5th Cir. 2019) ("Though the complaint need not contain 'detailed factual allegations,' it must contain sufficient factual material to 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" (quoting *Iqbal*, 556 U.S. at 678)).[15]

A.    <u>Fraud Claims</u>

In order to succeed on their fraud claims, Plaintiffs' pleadings must also satisfy the federal pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.  *See Pace v. Cirrus Design Corp.*, 93 F.4th 879, 889 (5th Cir. 2024); *Port of Corpus Christi Auth. v. Sherwin Alumina Co., L.L.C. (In re Sherwin Alumina Co., L.L.C.)*, 952 F.3d 229, 235 (5th Cir.), *cert. denied*, 141 S. Ct. 360 (2020).  Rule 9(b) provides that in order to state a claim for fraud in federal court, the plaintiff must state with particularity the circumstances constituting the fraud.  *See* Fed. R. Civ. P. 9(b); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007); *Pace*, 93 F.4th at 889-90; *Stringer v. Remington Arms Co., L.L.C.*, 52 F.4th 660, 661 (5th Cir. 2022).  Specifically, Rule 9(b) states:   "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Therefore, Rule 9(b) imposes a heightened standard of pleading for averments of fraud.  *See* Fed. R. Civ. P. 8(a), 9(b); *Pace*,

---

[15] A factual assertion or theory of liability not set forth in the complaint is not properly before the court on a motion to dismiss.  *See Law v. Ocwen Loan Servicing, L.L.C.*, 587 F. App'x 790, 793 n.2 (5th Cir. 2014) ("Review of a Rule 12(b)(6) dismissal is, by its very nature, limited to the allegations and theories set forth in the complaint that the district court had before it when granting the motion to dismiss."); *Vandelay Hosp. Grp. LP v. Cincinnati Ins. Co.*, No. 3:20-CV-1348-D, 2020 WL 5946863, at *1 n.3 (N.D. Tex. Oct. 7, 2020) ("This court has repeatedly held that, when ruling on a motion to dismiss, the court does not consider additional facts that are alleged in a response brief but not in the complaint." (collecting cases)); *Mohamed v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 620 n.10 (N.D. Tex. 2017) (rejecting plaintiff's attempt to introduce a theory of liability for the first time in response to defendant's motion to dismiss); *Elton Porter Marine Ins. Agency v. Markel Am. Ins. Co.*, No. H-11-4432, 2012 WL 2050254, at *2 (S.D. Tex. June 6, 2012) ("[I]t is insufficient to allege further facts in the response to the motion to dismiss; the factual matter must be contained in the pleadings themselves.").

93 F.4th at 889; *In re Sherwin Alumina Co., L.L.C.*, 952 F.3d at 235.  A party must plead, at the minimum, the "who, what, when, where, and how of the alleged fraud."  *In re Sherwin Alumina Co., L.L.C.*, 952 F.3d at 235.

Although not clearly articulated, the court must address each fraud claim Plaintiffs appear to allege.[16]  The statements or instances of nondisclosure that Plaintiffs contend are actionable consist of Silver Fern's withholding from Plaintiffs that it had ceased selling BDO and Silver Fern's provision of altered emails to the Government.[17]  Plaintiffs assert that these actions support their claims for fraud, fraud by nondisclosure, constructive fraud, and negligent misrepresentation. Defendants retort, however, that Plaintiffs have failed to plead any plausible claims for relief, much less satisfy the more stringent demands of Rule 9(b).

---

[16] In a related vein, Plaintiffs, throughout their filings, contend that the Government, by way of the altered emails, created a "fictitious standard" that the Government then "used against . . . Plaintiffs to take their property, close their business, cause them irreparable harm, and leave them the victims of an unjust criminal prosecution."  Plaintiffs, however, never articulate how this assertion establishes a claim for fraud against Silver Fern or Franco.  As discussed below, Plaintiffs do not contend that any communication regarding this "fictitious standard" was made to Plaintiffs.  Indeed, under this theory, it was the Government that "relied" on Defendants' statements.  More importantly, however, this is not the appropriate forum in which to litigate the merits of the Daughtrys' criminal prosecution or to assert their claims of innocence.  The Daughtrys have made their views regarding the lawfulness of their criminal prosecution known, *see, e.g.*, *Daughtry v. Englade*, No. 1:22-CV-240, 2023 WL 7386702, at *13 (E.D. Tex. Oct. 17, 2023), and those issues are not ripe for reconsideration in this action.

[17] Plaintiffs also allege, in their response to Silver Fern's motion to dismiss, that Silver Fern made "false statements" to Plaintiffs.  Ostensibly, this involved telling Plaintiffs that Silver Fern was having supply chain issues rather than exiting the BDO market.  There is, however, no assertion in Plaintiffs' complaint that these statements were actually made, although such statements are intimated in their exhibits. (#21, Ex. 9, 10).  Furthermore, Plaintiffs have shifted back and forth regarding which defendant provided the altered emails to the Government.  When arguing that this court has personal jurisdiction over Franco, Plaintiffs repeatedly contended that it was Franco who provided the altered emails to the Government pursuant to the subpoena.  At other points, Plaintiffs aver that it was Silver Fern who produced them.  In any event, for purposes of a Rule 12(b)(6) analysis, the court will analyze Plaintiffs' claims with the view that Silver Fern provided the altered emails to the Government—although, no matter which defendant handed them over, Plaintiffs are unable to state any plausible claims based on these assertions.

1.    Actual Fraud

In Texas, common law fraud may consist of an affirmative misrepresentation or, in certain circumstances, the concealment or nondisclosure of a material fact.  To recover for actual fraud through an affirmative misrepresentation, the plaintiff must establish that:

> (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury.

*Wesdem, L.L.C. v. Ill. Tool Works, Inc.*, 70 F.4th 285, 291 (5th Cir. 2023); *CBE Grp., Inc. v. Lexington L. Firm*, 993 F.3d 346, 350 (5th Cir. 2021) (quoting *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018)); *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 218 (5th Cir. 2018).

Although Plaintiffs do not specifically identify which allegedly fraudulent statement is associated with this claim, taking all facts in the light most favorable to Plaintiffs, the court must nonetheless determine whether Plaintiffs have stated any plausible basis for relief.  Silver Fern contends, with respect to Plaintiffs' claim that it provided the Government with altered emails, that Plaintiffs cannot plausibly state a claim for actual fraud because Plaintiffs have not alleged that Silver Fern made any representation to Plaintiffs, intended for Plaintiffs to rely on any representation, or that Plaintiffs did rely on any representation.  Silver Fern is correct.  Plaintiffs have not stated a plausible claim for relief based on the provision of altered emails to the Government.  Indeed, under Plaintiffs' theory, the misrepresentation was made to the Government rather than Plaintiffs.  Further, Plaintiffs do not contend that they relied or that Silver Fern intended

24

for Plaintiffs to rely on the altered emails because, according to their complaint, it was the Government that relied on these emails to create the "false" and "fictitious" standard with which it prosecuted the Daughtrys.  *See JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 653 ("[T]he plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable."); *see also Houle v. Casillas*, 594 S.W.3d 524, 564 (Tex. App.—El Paso 2019, no pet.) ("A claim for actual fraud therefore involves dishonesty of purpose or intent to deceive.").  In this regard, Silver Fern accurately notes that "Plaintiffs' theory of fraud seems to be that [Silver Fern] did not intend for Plaintiff[s] to become aware of [its] alleged false representation to the government."

Nevertheless, Plaintiffs correctly point out that a fraud claim may be based on a defendant's misrepresentation to another.  Specifically, however, for a fraud cause of action to exist, the false representation must "be made with a view of reaching the third person to whom it is repeated, and for the purpose of influencing him."  *Harrison v. Meritz Fire & Marine Ins. Co., Ltd.*, No. 14-18-00336-CV, 2020 WL 2070660, at *7 (Tex. App.—Houston [14th Dist.] Apr. 30, 2020, pet. denied) (quoting *Gainesville Nat'l Bank v. Bamberger*, 13 S.W. 959, 961 (1890)); *see Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001).  In other words, "[w]here a party makes a false representation to another with the intent that it should be repeated to a third party the third party can maintain an action in tort against the party making the false statement for the damages resulting from the fraud."  *Harrison*, 2020 WL 2070660, at *7 (citing *Am. Indem. Co. v. Ernst & Ernst*, 106 S.W.2d 763, 765 (Tex. Civ. App.—Waco 1937, writ ref'd)).  Plaintiffs have not alleged that any representation Silver Fern made to the Government was

intended to reach and influence the Daughtrys or that the representation was communicated to the Daughtrys such that they relied on it to their detriment.

In addition, although Silver Fern does not address this point, Plaintiffs contend that, after Silver Fern decided to stop selling BDO without informing Plaintiffs of this fact, Silver Fern then made misrepresentations to Plaintiffs on this basis.  That is, Silver Fern told Plaintiffs that it was having supply chain issues when, in fact, it was out of the BDO business.  The problem with this theory, however, is that Plaintiffs have not alleged with specificity that these communications took place.  To be sure, Plaintiffs provide ample support for their assertion that Silver Fern decided not to tell Plaintiffs that it would no longer sell BDO (#21, Ex. 10, 12), but they have not provided any support for their claim that Silver Fern affirmatively represented to Plaintiffs that it was having supply chain issues rather than telling them that it was ceasing BDO sales.  Thus, Plaintiffs have failed to identify sufficiently the "when," "where," and "how" of these allegedly fraudulent misrepresentations as required by Rule 9(b).[18]

### 2.    Fraud by Nondisclosure

Fraud by nondisclosure, a subtype of fraud, "occurs when a party has a duty to disclose certain information and fails to disclose it."  *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019) (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)).  Fraud by nondisclosure requires a plaintiff to show:

---

[18] Although Plaintiffs do not appear to contend that Franco's original emails to Plaintiffs constitute fraud, were they to make such an assertion, it would fail for many of the same reasons discussed above.  Chief among them, however, is the fact that Plaintiffs do not allege that Franco or anyone at Silver Fern had any intent to defraud Plaintiffs at this early stage.  Indeed, Plaintiffs do not contend that the "cooperative relationship" between Silver Fern and the Government materialized until years after the initial 2017 email.

> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury.

*Bombardier Aerospace Corp.*, 572 S.W.3d at 219-20; *Baxsto, LLC v. Roxo Energy Co., LLC*, 668 S.W.3d 912, 928 (Tex. App.—Eastland 2023, pet. filed); *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied); *see Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).  There is generally "no duty to disclose without evidence of a confidential or fiduciary relationship." *Bombardier Aerospace Corp.*, 572 S.W.3d at 220 (citing *Ins. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)).  There may, however, "also be a duty to disclose when the defendant:  (1) discovered new information that made its earlier representation untrue or misleading; (2) made a partial disclosure that created a false impression; or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth." *Id*.; *Baxsto, LLC*, 668 S.W.3d at 933; *see Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp. 2d 482, 498-99 (N.D. Tex. 2001).

According to the complaint, Plaintiffs rely on only two avenues to assert a fraud claim based on nondisclosure.  First, they contend that Silver Fern had a duty to disclose that it was exiting the BDO business.  Second, their complaint intimates a nondisclosure theory based on Silver Fern's failure to provide Plaintiffs with the SDS for which Franco later altered emails to make it appear as if it were included.  Silver Fern asserts that Plaintiffs are unable to state a claim on either of these grounds because Silver Fern owed no duty to disclose this information to Plaintiffs and, further, because Plaintiffs have not alleged "how either omission was intended to or did induce Plaintiffs' reliance."

At the outset, Plaintiffs have failed to demonstrate that Silver Fern had a duty to disclose this information to Plaintiffs. For one, Plaintiffs have failed to allege the existence of a fiduciary relationship between Plaintiffs and Silver Fern. A fiduciary relationship may "take two forms: '(1) a formal fiduciary relationship arising as a matter of law, such as between partners or an attorney and a client, and (2) an informal or confidential fiduciary relationship arising from a moral, social, domestic, or merely personal relationship where one person trusts in and relies on another.'" *In re Est. of Grogan*, 595 S.W.3d 807, 817 (Tex. App.—Texarkana 2020, no pet.) (quoting *Gray v. Sangrey*, 428 S.W.3d 311, 316 (Tex. App.—Texarkana 2014, pet. denied)). Plaintiffs do not allege that any formal fiduciary relationship exists in this case; rather, they seem to contend that an informal fiduciary relationship developed between them and Silver Fern. Courts, however, "remain cautious to create informal fiduciary relationships in business arrangements." *Gregan v. Kelly*, 355 S.W.3d 223, 228 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When determining whether an informal fiduciary relationship exists, courts are primarily concerned with "the nature of the relationship between the parties." *Id*. (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)). "The mere existence of mutual confidence and trust in the other party in a transaction does not, in itself, . . . create an informal fiduciary relationship." *Id*. (citing *Schlumberger Tech. Corp.*, 959 S.W.2d at 177). In that vein, "[a]n informal fiduciary relationship requires proof that, because of a close or special relationship, the plaintiff 'is in fact accustomed to be guided by the judgment or advice' of the other." *Id*. (quoting *Thigpen*, 363 S.W.2d at 253); *see Ritchie v. Rupe*, No. 05-08-00615-CV, 2016 WL 145581, at *4 (Tex. App.—Dallas Jan. 12, 2016, pet. denied). Further, where business transactions are involved, informal fiduciary duties are not owed "unless the special relationship of trust and confidence existed prior to, and apart

from, the transaction(s) at issue in the case." *Ritchie*, 2016 WL 145581, at *4 (citing *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005)).

Plaintiffs have not pleaded any facts to support the existence of an informal fiduciary relationship between them and Silver Fern.  Plaintiffs did not respond to Silver Fern's arguments on this point in their reply brief.  Moreover, even if Plaintiffs contend that they "trusted and relied on" the information Silver Fern provided to them throughout the course of their buyer-seller relationship, this would not "transform" their "arm's-length dealing into a fiduciary relationship." *Schlumberger Tech. Corp.*, 959 S.W.2d at 177.

Regarding a duty to disclose arising either from failing to disclose the whole truth, failing to disclose new information that makes earlier statements misleading, or disclosing information that crates a false impression, Plaintiffs have failed to advance a plausible claim that such a duty arose in this case.  *See Bombardier Aerospace Corp.*, 572 S.W.3d at 220.  As to a theory that Silver Fern was required to provide Plaintiffs with an SDS to accompany the initial invoice emails, Plaintiffs' complaint does not establish that any duty to disclose arose from this email correspondence.  The original email, even absent an SDS, does not appear to be only partially true or convey a false impression.[19]  *See Baxsto, LLC*, 668 S.W.3d at 933.  The email provided Jake with an invoice and

---

[19] Plaintiffs' complaint also references an SDS that is much less inclusive than the SDS that accompanied the altered emails.  Plaintiffs, however, do not disclose who provided this SDS to them.  Further, even assuming that Silver Fern provided this SDS to Plaintiffs at some point, Plaintiffs do not articulate when it was provided, who at Silver Fern sent it, or to whom it was directed at Right Price.  Thus, Plaintiffs' pleading in this respect fails to satisfy the demands of Rule 9(b).  Moreover, even if Plaintiffs clearly articulated that this less comprehensive SDS was provided by Silver Fern, Plaintiffs do not explain how providing this SDS would have created a duty to provide a more inclusive SDS at a later point.  That is, Plaintiffs do not demonstrate (or argue) that this SDS created a false impression, created a duty to disclose other information, or later became misleading.  *See Bombardier Aerospace Corp.*, 572 S.W.3d at 220.

informed him that his next order would be processed for shipment.  Further, according to the complaint, no new information later came to light that changed the nature of the original email. *Id*.  Additionally, even if Plaintiffs were to plead facts plausibly establishing that Silver Fern had a duty to disclose, they have failed to allege other essential elements of their nondisclosure claim. To that point, nothing in Plaintiffs' complaint plausibly alleges (or even asserts) that Plaintiffs "did not have an equal opportunity to discover" the facts contained in the SDS or that Silver Fern "intended [Plaintiffs] to act or refrain from acting based on the nondisclosure." *See Bombardier Aerospace Corp.*, 572 S.W.3d at 220.  Even still, Plaintiffs state in a conclusory fashion only that they relied on Silver Fern's nondisclosure.

Next, regarding Plaintiffs' allegation that Silver Fern was required to disclose that it was ceasing its BDO sales, Silver Fern first argues that it owed Plaintiffs no duty to disclose.  Yet again, Plaintiffs' complaint fails to establish that Silver Fern had a duty to disclose the facts regarding its departure from the BDO market.  To be certain, Plaintiffs have alleged (and attached supporting exhibits) that Silver Fern planned to withhold news of its market exit from Plaintiffs. Plaintiffs' exhibits indicate that, instead of informing Plaintiffs of its departure, Silver Fern would (falsely) claim to suffer from BDO supply chain issues when telling Plaintiffs that it was unable to fill their orders.  That said, and Silver Fern does not dispute this point, Plaintiffs' allegations clearly satisfy the deliberate concealment element of a nondisclosure claim.  As noted above, however, Plaintiffs' complaint does not allege facts demonstrating that Silver Fern carried out this plan—namely, that, after formulating its plan to withhold this information, Silver Fern reached out to Plaintiffs, telling them half-truths or lying to them.  Nonetheless, Silver Fern withheld this information.  Thus, the initial question is whether a duty to disclose existed.  As previously

discussed, no fiduciary duty, formal or informal, existed between the parties.  Next, regarding a duty to disclose arising from either failing to disclose the whole truth, new material information, or disclosing information that created a false impression, Plaintiffs have again failed to set forth a plausible claim that such a duty arose in this case.  *See id*.

Plaintiffs have not pleaded that Silver Fern discovered new information that made earlier information misleading, made some partial disclosure that created a false impression, or disclosed some information requiring the whole truth to be disclosed.  Had Plaintiffs plausibly pleaded that Silver Fern told them of supply chain issues, this may have triggered a duty to disclose based on a false impression.  Because Plaintiffs have not pleaded that such a communication occurred, however, Plaintiffs have not plausibly pleaded that Silver Fern owed Plaintiffs a duty to disclose its market exit.  Moreover, even if such a duty existed, Plaintiffs have failed to allege other necessary elements of a nondisclosure claim.

Silver Fern contends that Plaintiffs' complaint fails to state that Silver Fern's decision not to inform Plaintiffs of its determination that it would no longer sell BDO "was intended to or did induce Plaintiffs' reliance."  Silver Fern is correct—Plaintiffs do not plausibly allege facts supporting an allegation that Silver Fern intended Plaintiffs to rely on its nondisclosure.  Further, Plaintiffs allege only in a conclusory manner that they did in fact rely on this nondisclosure. Therefore, under any theory contemplated in their complaint, Plaintiffs have failed to allege a plausible claim for fraud by nondisclosure.

3.    Constructive Fraud

Constructive fraud, another variant of common-law fraud, is "the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Saden v. Smith*, 415 S.W.3d 450, 470 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (quoting *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964)).  When constructive fraud is asserted, "the actor's intent is irrelevant." *Houle*, 594 S.W.3d at 564 (citing *In re Est. of Kuykendall*, 206 S.W.3d 766, 770 (Tex. App.—Texarkana 2006, no pet.)).  "Constructive fraud may occur where one violates a fiduciary duty" or "a confidential relationship." *In re Est. of Kuykendall*, 206 S.W.3d at 770-71; *see Houle*, 594 S.W.3d at 564 ("As this Court has recognized, constructive fraud occurs when a party violates a fiduciary duty or breaches a confidential relationship." (citing *Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex. App.—El Paso 2010, pet. denied))).  Silver Fern asserts that, because Plaintiffs have failed to plead facts supporting the existence of any fiduciary duty or confidential relationship, this claim must also be dismissed.  Plaintiffs did not even respond to this argument in their response to Silver Fern's motion.  Nevertheless, as discussed above, Plaintiffs have failed to demonstrate that Silver Fern owed any duty, legal or equitable, to Plaintiffs.  *See Guajardo v. JP Morgan Chase Bank*, 605 F. App'x 240, 247 & n.5 (5th Cir. 2015).  Therefore, Plaintiffs have failed to plead a plausible claim for constructive fraud.[20]

---

[20] Indeed, in their complaint, Plaintiffs appear to argue that they are able to state a claim for constructive fraud by establishing the existence of a fiduciary duty between Silver Fern and themselves. Plaintiffs, however, have not provided any facts to support the existence of such a duty, as discussed in reference to Plaintiffs' nondisclosure claim.

4.    Negligent Misrepresentation

Under Texas law, to recover for negligent misrepresentation, the plaintiff must establish:

> (1) a representation made by a defendant in the course of its business or in a transaction in which it has a pecuniary interest; (2) the representation conveyed "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 653-54 (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)); *see Colbert v. Wells Fargo Bank, N.A.*, 850 F. App'x 870, 876 (5th Cir. 2021); *Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 123 (5th Cir. 2019).

Silver Fern contends that dismissal is appropriate as to Plaintiffs' negligent misrepresentation claim for the same reasons that their actual fraud claim is deficient. Silver Fern points out that Plaintiffs are unable to plead a plausible cause of action for negligent misrepresentation because the representation must be made to Plaintiffs or with the expectation that it be communicated to Plaintiffs (if initially communicated to a third party), and Plaintiffs must then rely on that representation. Silver Fern is again correct. For one, Plaintiffs have not stated a plausible claim for relief based on their assertion that Silver Fern provided altered emails to the Government. As previously discussed, under this theory, the misrepresentation was made to the Government rather than to Plaintiffs, and Plaintiffs do not assert that Silver Fern made this representation to the Government with the expectation that it would reach Plaintiffs. Further, Plaintiffs do not contend that they relied on or that Silver Fern intended for Plaintiffs to rely on the altered emails because, according to their complaint, it was the Government that relied on these

emails when prosecuting the Daughtrys.  Plaintiffs have not identified any other representation made by Silver Fern that would support their negligent misrepresentation claim.  Thus, Plaintiffs have failed to plead a plausible claim based on negligent misrepresentation.

### 5.   Justifiable Reliance

"Both common law fraud and negligent misrepresentation require a showing of actual and justifiable reliance." *Blankinship*, 399 S.W.3d at 308 (citing *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 238 (Tex. App.—Dallas 2012, no pet.)).  "Likewise," because fraud by nondisclosure is a subcategory of fraud, "reliance is a necessary element of fraud by nondisclosure." *Id.* (citing *Schlumberger Tech. Corp.*, 959 S.W.2d at 181).  Accordingly, for Plaintiffs to allege a viable fraud or negligent misrepresentation claim, Plaintiffs must also plausibly plead that they justifiably relied on the information that Silver Fern did or did not disclose to them.  Plaintiffs' theories, with respect to this element, suffer from marked defects.

To prove justifiable reliance, a plaintiff is required to show that "(1) it actually relied on the defendant's representation; and (2) such reliance was justifiable." *Baxsto, LLC*, 668 S.W.3d at 934-35 (citing *JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 653).  As to each fraud or negligent misrepresentation claim, Plaintiffs have failed to allege, in more than a conclusory fashion, that they relied on the various statements or omissions with which they now take issue or that such reliance was justifiable.  Further, based on Plaintiffs' pleadings, they appear to be unable to plead plausibly that their reliance (if any) was justifiable.

Regarding justifiable reliance, "[i]n an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests . . . . [A] failure to exercise

reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party."  *Id*. at 935 (quoting *JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 654); *see Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 425 (Tex. 2015).  "And when a party fails to exercise such diligence, it is 'charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated.'"  *JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 654 (quoting *AKB Hendrick, LP*, 380 S.W.3d at 232).  Furthermore, a "party 'cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations.'"  *Id*. (quoting *Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland May 29, 2015, pet. denied)).

The only reliance theory arguably included in Plaintiffs' complaint that relates to their own conduct rather than the Government's alleges that Plaintiffs, specifically Right Price, relied on "critical information" (or the lack thereof) from Silver Fern "through the course of its dealings with [Right Price]."  According to this theory, the "critical information" was contained in the later-added SDS, and the information on which Plaintiffs focus is, in their own words, "the fact that [the SDS] purports to tie [BDO] to the date rape drug GHB."  Plaintiffs contend that this information was "never provided" to Right Price or the Daughtrys prior to the Daughtrys' prosecution.  While Plaintiffs do not explain what specific actions they took in reliance, ostensibly, Plaintiffs' theory is that they continued to distribute BDO, being unaware of its relation to GHB, and, had they known of the relation, they would have ceased all BDO distribution or engaged in

lawful distribution.[21]  The exact theory is unclear and is not articulated in Plaintiffs' complaint. Significantly, this theory appears to relate only to conduct that Plaintiffs do not contend was fraudulent—that is, the initial emails Franco sent to Jake that did not include an SDS.  Plaintiffs clarify in their complaint that "the fraud was committed" during Silver Fern's "relationship" with the Government, which did not begin until November 2019.  Nonetheless, while there are numerous issues with this theory, in this instance, the relevant point is that Plaintiffs have not plausibly pleaded that their claimed reliance was justifiable.

Plaintiffs state in their complaint that, on December 4, 2019, in the days following the Government's initial subpoena requesting documents from Silver Fern, Right Price received an email from Silver Fern stating:  "It has come to our attention that although [BDO] is not a controlled substance listed by the DEA, it can be diverted for illicit use," and noting: "We can ship this out ASAP, but before we ship this to you, we need to have you fill out another regulatory form from the DEA."  Importantly, the acts of fraud about which Plaintiffs complain took place after Right Price received this email.  After December 2019, however, Plaintiffs (even assuming they were not before) were clearly on notice of BDO's potential for misuse.  Accordingly, Plaintiffs' complaint seems to negate any potential justifiable reliance on "critical information" provided or withheld by Silver Fern after this time.

Furthermore, the Daughtrys owned and operated a chemical distribution company, an industrial supply company, and a lab chemical supply company and employed a chemist.  With that

---

[21] As discussed above, however, knowledge of BDO's relation to GHB alone in no way alters the basis on which the Daughtrys were prosecuted.  The issue in the prosecution was whether the Daughtrys knew that BDO was being consumed and knew that they were selling to unauthorized purchasers. Knowledge of exactly how BDO is absorbed and metabolized in their customers' bodies was not required for purposes of the prosecution.

in mind, it is apparent that Plaintiffs' "knowledge, experience, and background" dictated an investigation into Silver Fern's representations.  *See Baxsto, LLC*, 668 S.W.3d at 934-35; *JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 654.  Through Right Price, the Daughtrys were purchasing chemicals from one company to then sell to individual consumers.  They could not rely blindly on the information they received from their supplier.  Indeed, it appears that a brief investigation into BDO would have revealed, among other things, its connection to GHB.  Relevant to this point, Plaintiffs attached as an exhibit to their complaint a BDO fact sheet produced by the DEA, which plainly states BDO's relation to GHB.  (#21, Ex. 11).  Plaintiffs have not demonstrated why they should not be "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." *JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 654 (quoting *AKB Hendrick, LP*, 380 S.W.3d at 232).  In any event, Plaintiffs have failed to plead justifiable reliance adequately as to any of their fraud claims or their negligent misrepresentation claim.

    B.    <u>Failure to Warn</u>

Although Plaintiffs' complaint is vague as to exactly what cause of action they assert, Count Four of the complaint states "Failure to Warn by Silver Fern."  As a result, Silver Fern assumes in its motion to dismiss that Plaintiffs are attempting to assert a "product liability cause of action." In their response to the motion, Plaintiffs confirm that they are in fact attempting to assert a products liability cause of action.

"The Texas Supreme Court has explained that 'a defendant's failure to warn of a product's potential dangers when warnings are required is a type of marketing defect,'" and, in general, "a manufacturer has a duty to warn if it knows or should know of the potential harm to a user because

of the nature of its product.'"  *Smith v. Robin Am., Inc.*, 484 F. App'x 908, 912 (5th Cir. 2012)

(quoting *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997)).  To establish a claim

for a marketing defect, a plaintiff must show five elements:

> (1) a risk of harm must exist that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product, (2) the supplier of the product knows or reasonably should foresee the risk of harm at the time the product is marketed, (3) the product has a marketing defect, (4) the lack of instructions or warnings renders the product unreasonably dangerous to the ultimate user or consumer of the product, and (5) the failure to warn or instruct causes the user's injury.

*Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 480 (Tex. App.—Houston [1st Dist.]

2007, pet. denied) (citing *Olympic Arms, Inc. v. Green*, 176 S.W.3d 567, 578 (Tex.

App.—Houston [1st Dist.] 2004, no pet.)); *see USX Corp. v. Salinas*, 818 S.W.2d 473, 482-83

(Tex. App.—San Antonio 1991, writ denied) ("[T]he failure to warn and/or instruct must constitute

a causative nexus in the product user's injury.").

Silver Fern resists Plaintiffs' claim by noting that "any actual injury from any alleged

'failure to warn' would be to the end user of the product," not to an intermediate distributor such

as Right Price.  Plaintiffs respond by contending that they were the "end user" of the product

because Silver Fern claims that it had Right Price sign an "end user form."  Nonetheless, the fact

that Silver Fern required Right Price to sign an "end user form" to comply with its obligation to

distribute BDO only to authorized purchasers does not transform Right Price, or any of Plaintiffs

for that matter, into end users such that they may plausibly allege a products liability cause of

action.

Plaintiffs are not the ultimate or end "users" of BDO in this case.  They were a secondary distributor of the product.  The Daughtrys did not "use" BDO; they purchased it from Silver Fern to sell to the ultimate and actual "user" of the product.  Thus, although Plaintiffs allege injuries due to Silver Fern's failure to warn, they do not maintain that "the failure to warn or instruct cause[d] the user's injury," or, in other words, they do not allege that "the failure to warn . . . constitute[s] a causative nexus in the product user's injury."  *See USX Corp.*, 818 S.W.2d at 483; *see also Ranger Conveying & Supply Co.*, 254 S.W.3d at 480.  Nor would Plaintiffs be able to assert an action on behalf of the users.  Moreover, the type of injury about which Plaintiffs complain does not involve the sort of "harm" these products liability actions are intended to remedy.  *See* RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 13 cmt. a (1998).  That is, these actions are intended to remedy harm, inflicted upon product users, to their "persons or property," rather than harm caused by an intermediate distributor's failure to sell a product lawfully that it purchased from a prior distributor.  *Cf. id.*  On that note, the type of harm Plaintiffs assert also is not "inherent in the product" nor does it "arise from the intended or reasonably anticipated use of the product." *See Ranger Conveying & Supply Co.*, 254 S.W.3d at 480.  Accordingly, Plaintiffs have failed to plead a plausible failure to warn cause of action.

C.    Civil Conspiracy

"In Texas, a civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Bates Energy Oil & Gas, L.L.C. v. Complete Oil Field Servs., L.L.C.*, No. 20-50952, 2021 WL 4840961, at *3 (5th Cir. Oct. 15, 2021) (quoting *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996)); *accord Ernst & Young, L.L.P.*, 51 S.W.3d at 583.  Under Texas law, the elements of a civil

conspiracy claim are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Civelli v. J.P. Morgan Sec.*, *L.L.C.*, 57 F.4th 484, 492 (5th Cir.) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)), *cert. denied*, 143 S. Ct. 2585 (2023); *accord WickFire, L.L.C. v. Woodruff*, 989 F.3d 343, 358 (5th Cir. 2021); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). The goal of a conspiracy allegation is to extend liability in tort beyond the active wrongdoer to those who may have merely planned, assisted, or encouraged the wrongdoer. *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 140 (Tex. 2019).

As part of a civil conspiracy claim, a plaintiff is required to prove that one or more unlawful, overt acts were taken in pursuance of the unlawful objective. *WickFire, L.L.C.*, 989 F.3d at 358; *Parker*, 514 S.W.3d at 222. Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort." *Tummel v. Milane*, 787 F. App'x 226, 227 (5th Cir. 2019) (quoting *Agar Corp., Inc.*, 580 S.W.3d at 142). The Texas Supreme Court has "repeatedly called civil conspiracy a 'derivative tort,' meaning it depends on some underlying tort or other illegal act." *Agar Corp., Inc.*, 580 S.W.3d at 140-41; *accord WickFire, L.L.C.*, 989 F.3d at 358; *Tummel*, 787 F. App'x at 227. The "use of the word 'derivative' in this context means a civil conspiracy claim is connected to the underlying tort and survives or fails alongside it." *Agar Corp., Inc.*, 580 S.W.3d at 141; *accord WickFire, L.L.C.*, 989 F.3d at 358; *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 248 (5th Cir. 2020). Thus, a "civil conspiracy requires some underlying wrong." *Agar Corp., Inc.*, 580 S.W.3d at 141. "If a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil

40

conspiracy necessarily fails." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007); *accord Agar Corp., Inc.*, 580 S.W.3d at 141.  Accordingly, because Plaintiffs have failed to allege any other plausible cause of action, they have also failed to allege a plausible civil conspiracy claim.[22]

In sum, Plaintiffs have failed to state any plausible claim for relief.[23]  Accordingly, Plaintiffs' Amended Complaint must be dismissed.[24]  In that regard, Defendants urge the court to dismiss Plaintiffs' complaint with prejudice.

## V.   Opportunity to Amend

As a general matter, a court should not dismiss an action for failure to state a claim under Rule 12(b)(6) without first giving the plaintiff an opportunity to amend.  *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in dismissal of the complaint with prejudice to refiling); *see also Strickland v. Bank of N.Y. Mellon*, 838 F. App'x 815, 821 (5th Cir. 2020);

---

[22] Moreover, "a general allegation of conspiracy[,] without a statement of the facts constituting that conspiracy, is only an allegation of a legal conclusion and is insufficient to constitute a cause of action." *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 631-32 (5th Cir. 1999) (quoting *McCleneghan v. Union Stock Yards Co. of Omaha*, 298 F.2d 659, 663 (8th Cir. 1962)); *accord Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 666 n.16 (5th Cir. 2004).  Here, Plaintiffs have alleged in a conclusory fashion only that Silver Fern and Franco agreed with one another and others to injure Plaintiffs.  These allegations are insufficient to state a claim for civil conspiracy.

[23] Further, even if Plaintiffs were able to establish a *prima facie* case of personal jurisdiction as to Franco, for many of the same reasons discussed above regarding Silver Fern's conduct, Plaintiffs are unable to plead any legally cognizable claims against Franco (common law fraud, fraud by nondisclosure, constructive fraud, negligent misrepresentation, or civil conspiracy).

[24] Because no Plaintiff has plausibly alleged any claim for relief, the court declines to reach Defendants' judicial estoppel argument, in which they contend that both Jake and Joseph are estopped from asserting the above claims in contravention of their guilty pleas.

*Young v. U.S. Postal Serv. ex rel. Donahoe*, 620 F. App'x 241, 245 (5th Cir. 2015); *accord* FED. R. CIV. P. 16(b).

Where, however, "the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so," a court may dismiss a plaintiff's claims without such an opportunity. *Hart*, 199 F.3d at 248 n.6. "The district court properly exercises its discretion . . . when it denies leave to amend for a substantial reason, such as undue delay, repeated failures to cure deficiencies, undue prejudice, or futility." *Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 575 (5th Cir. 2021) (quoting *U.S. ex rel. Spicer v. Westbrook*, 751 F.3d 354, 367 (5th Cir. 2014)).

Here, Plaintiffs seek an opportunity to amend their complaint once again to cure any defects, but it appears that additional amendments would be unavailing in this situation.  For the reasons discussed above, Plaintiffs are unable to plead a viable claim for any variant of fraud, negligent misrepresentation, failure to warn, or civil conspiracy, and, as such, leave to amend would be futile.  Plaintiffs have already amended their complaint once in this action—in the face of two motions to dismiss—and Plaintiffs amended their complaint three times in the prior federal court matter against Defendants (Civil Action No. 1:22-CV-239, #s 7, 32, 47).  Hence, Plaintiffs have been afforded ample opportunity to rectify any pleading defects.  Moreover, upon asking for leave to amend at this stage in the proceedings, Plaintiffs have not indicated what additional facts they "could plead that would correct the deficiencies in [their] previous complaints." *U.S. ex rel. Adrian v. Regents of Univ. of Cal.*, 363 F.3d 398, 404 (5th Cir. 2004)*; see Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 n.38 (5th Cir. 2010).  Therefore, granting leave to amend is unwarranted.

VI.    <u>Conclusion</u>

Accordingly, both Franco's Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) (#23) and Silver Fern's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim (#25) are GRANTED.  Plaintiffs' complaint is DISMISSED with prejudice.

SIGNED at Beaumont, Texas, this 16th day of May, 2024.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE